UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

RICHARD M. GAALSWYK,                        CIVIL NO. 10-411 (PJS/JSM)

    Plaintiff,                          REPORT AND RECOMMENDATION

v.

BEATRICE E. KING,

    Defendant.


The above matter came on before the undersigned on defendant Beatrice King's Motion for Summary Judgment [Docket No. 52] and plaintiff Richard Gaalswyk's Motion and Application for Attorney's Lien and Motion for Summary Judgment [Docket No. 75]. Plaintiff appeared pro se. Judith M. O'Donohoe, Esq. appeared on defendant's behalf. This matter was referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1.


## I.  BACKGROUND

Attorney Richard Gaalswyk sued his sister Beatrice King for legal fees Gaalswyk claimed King owed him for work he performed on her behalf. Gaalswyk filed the suit in state district court in Washington County, Minnesota and King removed the matter to U.S. District Court pursuant to 28 U.S.C. § 1332. Notice of Removal [Docket No. 1]. Gaalswyk is a Minnesota resident, King is an Iowa resident, and the legal fees at issue exceed $75,000. Notice of Removal, ¶1, Complaint, ¶¶1, 2, 79 [Docket No. 1-1].

1

Gaalswyk holds a B.A. from Yale University and a J.D. from the University of Michigan, which he received in 1973.    Affidavit of Richard Gaalswyk in Support of Motion for Summary Judgment, ("G5 Aff."), Ex. 5.a [Docket No. 100].   From 1973 to 2000, Gaalswyk practiced with the St. Paul firm of Maun and Simon.   Affidavit of Richard Gaalswyk in Support of Motion for Summary Judgment, G4, ¶1 ("G4 Aff.") [Docket No. 78].   Maun and Simon disbanded at the end of 2000 and since that time Gaalswyk has maintained a law practice, which he operates from his home.   Id. Gaalswyk's normal rate for legal services is $300 per hour.   G4 Aff., ¶12.

In December 2003, King and her then-husband David King were sued in Iowa state court in an action arising out of an allegedly fraudulent conveyance of assets from David King to King (the "Iowa litigation").   King retained Iowa attorney J. Matt Anderson to represent her in the Iowa litigation.   Affidavit of Beatrice King in Support of Motion for Summary Judgment ("King Aff."), ¶5 [Docket No. 59]; Affidavit of J. Matthew Anderson in Support of Defendant's Motion for Summary Judgment, ¶2 [Docket No. 58]. Gaalswyk contended that King was unhappy with Anderson's representation and contacted him in February 2005, after having lost a motion for summary judgment in the Iowa litigation.   G4 Aff., ¶9.   Gaalswyk further contended that King told him that Anderson had assured her that the motion was a "slam dunk."   Id.  In February 2005, King mailed to Gaalswyk a copy of the order denying summary judgment, together with the first page of a letter from Anderson to her, enclosing the order.   G4 Aff., ¶10; G5 Aff., Ex. B [Docket No. 101].   In his letter to King, Anderson stated that David King's testimony at trial "would be crucial to our case."   Id.

King does not deny sending Gaalswyk a copy of the order denying summary judgment, but stated that she did so at Gaalswyk's request.  King Aff., ¶9.  On February 28, 2005, Gaalswyk wrote to Anderson, without King's knowledge or consent, excoriating him for his performance in the Iowa litigation.  King Aff., Ex. F ("I am not sure whether you or the judge are more confused. * * * If David King's testimony is crucial to your case, you are set up to lose. * * * I have not discussed this letter in advance with Bea [King].").

Gaalswyk claimed that it was at this point, in April 2005, that King asked him to review the papers in the Iowa litigation and advise her on what to do next.  G4 Aff., ¶12.  Gaalswyk told King he would do as she asked but that she must pay him for his time "based on the hours he worked and his normal hourly rate of $300…when she could and must come to Minnesota and do all she could to help.  King agreed to [these] terms and conditions."  Id.  King adamantly denied that she entered into any kind of agreement to pay Gaalswyk for his time.  King Aff., ¶12.  It is undisputed that there is no written retainer agreement between Gaalswyk and King.

Gaalswyk alleged that on April 17, 2005, King delivered a large volume of documents related to the Iowa litigation to him at his office in Minnesota.  G4 Aff., ¶13.  Gaalyswyk analyzed the documents and "reluctantly decided he would help her, subject to conditions."  Id., ¶16.  According to King, Gaalswyk called her in April 2005, and suggested that she come to his house and stay with him and help him work on projects around the house in exchange for his work on the Iowa litigation.  King Aff., ¶12.  King did that, and returned to his house "about twice a month and stayed for four or five days each time doing work for [Gaalswyk] as he directed around his house, horse barns and

greenhouse." Id. King stated that her work for Gaalswyk was to be the quid pro quo for his work on the Iowa litigation. Id., ¶14.

Gaalswyk was admitted to Iowa state court pro hac vice and took an active role in the Iowa litigation, ultimately trying the case with Anderson. King Aff, Ex. A (Anderson's billing records, reflecting Gaalswyk's admission and numerous conversations with Gaalswyk between March 1, 2005 and September 27, 2005); G4 Aff., ¶24 ("After discussion with Iowa Counsel and King, Gaalswyk offered to try the case, with Iowa Counsel assisting as local counsel and second chair. Iowa Counsel readily agreed."). Gaalswyk submitted email correspondence between himself, Anderson, King and King's appellate and current counsel, Judith O'Donohoe, in 2005 when he was working on the Iowa litigation. G5 Aff., Ex. A. These emails, beginning on July 12, 2005, indicate the following regarding Gaalswyk's work on the Iowa litigation:

- Gaalswyk prepared a 15-page chronology for Anderson's use. Id., p. 4-5.

- King worked with Gaalswyk in Minnesota on the chronology, an affidavit and a brief. Id., p. 7.

- Gaalswyk wrote to Anderson that he wanted to be admitted in Iowa for the case, that he "meant business" when it came to the Iowa litigation. Id., p. 12 (copied to King).

- Gaalswyk appeared to take the lead role in drafting the motion for reconsideration of the Iowa court's summary judgment. Id., p. 15-22; 37-38.

- King wrote to Gaalswyk on July 25, 2005: "[s]tart your list of my 'things to do' when I come back to give you some more of my time to help you in some way." Id., p. 26.

- King wrote to Gaalswyk on August 2, 2005: "[a]lso, I am available to come and help you when you want me to. You have been so good to me." Id., p. 42. On August 16, 2005 she wrote: "[t]hanks for saying you don't regret taking my case. I had NO idea the time you would put in." Id., p. 48.

- Before trial Gaalswyk wrote to King of his frustration with Anderson: "I think it is time to fire Matt and hire a new lawyer…[w]e need to get judge Drew off the case too." King responded: "You are the boss. I need you to represent me in the courtroom." Id., p. 76.

- On September 17, 2005 King wrote to Gaalswyk: "I feel like throwing up just thinking about having another postponement. You have the final say but that is what I am thinking. We had pretty much told Matt in April that you were taking over. He knows what we think of him." Id., p. 90. On September 19th she wrote: "I hope you [Gaalswyk] decide to go ahead with the trial. I am confident that with you as my head lawyer we will win. You told Matt all we needed him for was to get things in order for the trial." Id., p. 92.

King obtained a favorable outcome in the Iowa litigation, which Gaalswyk attributed to his work on the case. G4 Aff., ¶25, 26. The plaintiff appealed and King retained O'Donohoe as her appellate counsel. King has denied that she ever asked Gaalswyk to do any work on her appeal. King Aff., ¶20. However, O'Donohoe sent Gaalswyk an email on June 2, 2006, in which she stated that "[t]he one thing that you could do to be helpful, is to glance over the two briefs that have been filed and indicate what points you believe are important to make. I will then factor that in with my opinion and write a brief." King Aff., Ex. M. After King retained O'Donohoe to handle the appeal, Gaalswyk stayed involved with the case, frequently emailing O'Donohoe, and copying King on those emails. See G5 Aff., Ex. C [Docket No. 103]. Gaalswyk became worried when O'Donohoe expressed her concern about her ability to meet the briefing schedule and indicated to Gaaslwyk that she may seek an extension of time from the court. Id., p. 58. Gaalswyk warned O'Donohoe not to expect an extension, and indicated that he "may take a first shot at pasting together the brief I described above tomorrow. I am fearful of the Monday deadline." Id. King was copied on that email. Id. Gaalswyk tried to reach O'Donohoe on June 12, 2005 about the appellate brief and sent

her an email, indicating "[i]t is not acceptable for you to file a brief for Beatrice without me having a chance to review a draft in time to make comments.  I have spent close to three hundred hours understanding and developing the facts and the law behind Beatrice's position.  Being unable to reach you, I have made an effort to write a brief myself over the weekend, so at least something can be filed today."  Id., p. 59-60.  Gaalswyk copied King on this email.  Id.

On July 21, 2006, King asked Gaalswyk not to antagonize O'Donohoe and to "please spend your valuable time on your other clients."  Id., p. 66.  O'Donohoe sent Gaalswyk a copy of the appellate brief to review and Gaalswyk annotated the brief, apparently finding factual errors to which he alerted King.  Id., p. 69.  Gaalswyk alleged that King expressly authorized him to draft the appellate brief and send the draft to O'Donohoe.  G4 Aff., ¶29.

King claimed that in June 2006, Gaalswyk demanded payment of his legal fees for the first time.  King Aff., ¶¶13, 15.  King objected to this demand stating:

> At no time did I agree, before or after Gaalswyk was performing legal work for me, to pay him for his services at any rate.  Further, I did not receive a billing from Richard Gaalswyk during the time frame the case was occurring.
> * * *
> The first that I was aware that he was charging me for his services, other than the expenses for copying cases, which I advanced as the case went along, was when he demanded payment of $50,000 in person in June of 2006.  At that time he represented that this was the total sum I owed him for his services.  This demand was made when he requested I meet him at his residence in Minnesota soon after I received a pro-rata share of real estate proceeds from the liquidation of farmland from my mother's Trust.
> * * *
> I pointed out to [Gaalswyk] that I did not have a billing of any kind and was not aware I was being charged for his services while the services were being provided.  I asked to see his time records and

the only records he could produce was a list of pleadings he had filed and the number of pages in the pleadings.

Id.,¶15.

Gaalswyk demanded $50,000 in payment and "in order to placate [him], as he was extremely angry," King paid him $20,000 on June 6, 2006.   King Aff., ¶15, Ex. I (copy of check).   King alleged that at the same time she paid Gaalswyk the $20,000, he demanded that she convey to him her interest in a family building site, which she refused to do.   King Aff., ¶17, Ex. H (email correspondence between King and Gaalswyk dated October 7, 2006).   Gaalswyk, on the other hand, alleged that when King paid him the $20,000, she promised that he could have her entire share of the property as "payment on account."   G4 Aff., ¶36.   On September 26, 2006, Gaalswyk wrote to King, stating that he would "prepare the bill for you as you requested when time allows.   I will also send you the deed on the farm place to sign (sic) (along with Dave), as you agreed, with the bill."   G5 Aff., Ex. C, p. 74.

The appeal was decided in King's favor in March, 2007.   King Aff., ¶17.   After the appeal was complete, in July, 2008, King regained access to the annuity funds that were at issue in the Iowa litigation and then transferred those funds to another investment vehicle ("the Lincoln National Life funds").   Id., ¶31.

King received a letter from Gaalswyk on or about May 8, 2009, enclosing a bill for his services.   King Aff., ¶17, Ex. J (May 8, 2009 letter), Ex. K (bill for legal services). Gaalswyk's bill reflected time for legal services performed between February 28, 2005 and September 24, 2006, covering time associated the underlying Iowa litigation and appeal.   The bill, totaling $163,140.00, included $20,490 for time spent on King's appeal.   Id.

7

Gaalswyk's May 8, 2009, letter to King was twenty-five pages long, reiterated his position that King agreed to pay him for his work on the Iowa litigation in May 2005, and touched on everything from King's failure to pay Gaalswyk's legal bills (which he offered to discount to $130,000), to a review of his work on the Iowa litigation, to his lingering hurt that King did not help him move from an apartment in 1974.  King Aff., Ex. J, pp. 1-19, 23.  In this letter, Gaalswyk told King that she needed to be trained to tell the truth, her gardening and landscaping work was only worth $10 per hour, and she was unable to think in a disciplined manner.  Id., pp. 2, 3, 19, 23-24.  Gaalswyk's wife, Sheila, testified at her deposition that Gaalswyk sent her an "online version" of the letter, but that she was not aware of anyone other than she and Gaalswyk who had read it.  She did not discuss the letter with anyone.  Defendant's Memorandum in Support of Summary Judgment ("Def. Sum. J. Mem."), Appx. p. 453 [Docket No. 61] (excerpt of transcript of the deposition of Sheila Gaalswyk).  Sheila Gaalswyk also provided an affidavit in support of her husband's motion in which she stated Gaalswyk "e-mailed his draft of a letter to [King] in May 2009….I did not add anything to what the draft said, just review (sic) as discussed above and tell him what I found."  Affidavit of Sheila Gaalswyk in Support of Motion for Summary Judgment ("S. Gaalswyk Aff.") ¶ 8, 9 [Docket No. 105].

Gaalswyk admitted that he delayed sending King an invoice for his services, but explained that he waited until the Iowa Court of Appeals issued its ruling on the appeal because until then he could not ascertain what would be a "reasonable fee" pursuant to the Minnesota Rules of Professional Conduct.  According to Gaalswyk the reasonableness of his fee was related to the ultimate outcome of the case.  G4 Aff.,

¶40.  Further, he believed that if he sent the invoice before King knew the final outcome of the case, that King's "emotional distress would be increased" and it would "ruin the chance of a reasonable and cordial settlement on his fees."  Id.

On May 14, 2009, O'Donohoe wrote to Gaalswyk in response to Gaalswyk's letter demanding payment.  King Aff., Ex. N.  O'Donohoe noted that she told Gaalswyk that she would be handling King's appeal and that she did not need any help from him. Id.  O'Donohoe did not deny that there had ever been an agreement that King would pay Gaalswyk for his legal services; instead she stated that "Bea would prefer not to litigate over this matter, but she is not in a position to pay anything close to the $168,000.  In an effort to resolve the matter, she is willing to sign over her interest in the farm site.  If this is satisfactory to you, please let me know."  Id.  According to Gaalswyk, King's interest in the building site was worth $30,000.  G4 Aff., ¶37.

When King did not pay Gaalswyk anything more for his services, he commenced the instant suit alleging that King was liable to him based on various causes of action including  breach  of  contract,  equitable  and  promissory  estoppel,  fraudulent misrepresentation,  quantum  meruit,  quasi-contract,  unjust  enrichment,  and  account stated.  See Complaint, Counts I – VI.  In addition, in Count VII, Gaalswyk sought an attorney's lien pursuant to Minn. Stat. §481.13 on the funds King regained in the Iowa litigation, now transferred into the Lincoln National Life funds.  Id., ¶31.

King answered and counterclaimed for restitution of the $20,000 she had paid Gaalswyk, alleging that it had been paid under duress.  Amended and Substituted Answer and Counterclaim, ¶¶82-86 [Docket No. 21].  According to King, Gaalswyk had withheld payment to her of her share in their mother's estate until she paid him the

$20,000, and she paid this amount only "in order to receive some of her funds [from the distribution of the proceeds of the estate]." Id., ¶90.  King also asserted a counterclaim for legal malpractice, alleging that Gaalswyk made King believe that Anderson was not capable of defending the Iowa litigation, "insinuated" himself into the litigation and then performed duplicative and unnecessary work. Id., ¶¶98, 99.  King further alleged that Gaalswyk was not licensed to practice law in Iowa, and that "an additional specification of negligence occurred when Richard Gaalswky (sic) indicated that he could recover attorney's fees in the [Iowa litigation]… ." Id., ¶¶100, 101.  King claimed damages flowing from Gaalswyk's alleged malpractice in excess of $180,614.84. Id., ¶102. Finally, King alleged that Gaalswyk's statements in his letter to her of May 8, 2009, constituted libel, which he communicated to other family members. Id., ¶¶104-109.[1]

## II.    DISCUSSION

The parties have now made cross-motions for summary judgment on all of Gaalzwyk's causes of action, and Gaalswyk has moved for summary judgment on King's remaining counterclaims.

### A.    Standard of Review

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is "no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d

---

[1]    King also counterclaimed for civil extortion (Id., ¶¶87-95) but that counterclaim was dismissed by based on the parties' stipulation.  Stipulation for Dismissal of Counterclaim for Civil Extortion [Docket No. 45]; Order [Docket No. 47].

1217, 1219 (8th Cir. 1999). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" DePugh v. Smith, 880 F. Supp. 651, 656 (N. D. Iowa 1995) (quoting Anderson, 477 U.S. at 248).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed. Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995). "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial." Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 U.S. Dist. LEXIS 11439, *4-5 (D. Minn. 2003) (citations omitted); see also Fed. R. Civ. P. 56(c). The non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy." Wilson v. Int'l Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995).

## B.   Choice of Law

King contended that Iowa law should govern the question of whether King and Gaalswyk entered into an oral contract for the provision of legal services, and whether Gaalswyk was entitled to an attorney's lien pursuant to Minn. Stat. §481.13. Defendant's Memorandum in Support of Resistance to Motion for Summary Judgment

("Def. Opp. Mem."), p. 3-4, 9-10 [Docket No. 120]; Def. Sum. J. Mem., p. 16-17, 34.  At oral argument on the motions, King's counsel conceded that Minnesota and Iowa law were not significantly different regarding Gaalswyk's other claims.  Gaalswyk argued that Minnesota law should apply to all of the claims.  Plaintiff's Memorandum in Support of Motions to Establish Attorney's Lien and Summary Judgment.  ("Pl. Sum. J. Mem."), p. 13-15 [Docket No. 77].

The Court has diversity jurisdiction over this lawsuit.  Complaint, ¶¶1, 2, 81.  In a diversity case, a federal court applies the choice-of-law principles of the forum state.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Highwoods Props., Inc. v. Executive Risk Indem., Inc., 407 F.3d 917, 920 (8th Cir. 2005).  But before applying the forum state's choice-of-law rules, the Court must first determine if a conflict exists.  Prudential Ins. Co. of Am. V. Kamrath, 475 F.3d 920, 924 (8th Cir. 2007).  If a conflict does exist and it is outcome determinative, the Court must then analyze and apply Minnesota's choice-of-law rules to determine whether Iowa or Minnesota law should apply.  See Glover v. Merck & Co., Inc., 345 F.Supp.2d 994, 999 (D. Minn. 2004) ("[a] conflict exists if the rule of one state or the other is outcome determinative").  Furthermore, the Court must decide whether the law of each state may be constitutionally applied.  Id. at 995 (citing Jepson v. General Cas. Co. of Wi., 513 N.W.2d 467, 469 (Minn. 1994)).  To meet the requirement of constitutionality, "each state must have significant contacts or significant aggregation of contacts, creating a state interest, so that the choice of law is neither arbitrary nor fundamentally unfair."  Id. (citing Nodak Mut. Ins. Co. v. American Family Mut. Ins. Co., 590 N.W.2d 670, 672 (Minn. Ct. App. 1999)).

After establishing that a conflict between Minnesota law and Iowa law exists and that the Court may constitutionally apply the law of either state, the Court next considers Minnesota's choice-of-law rules.  Under these rules, the Court must first decide whether the rule of law at issue is substantive or procedural.  Glover, 345 F. Supp. 2d at 998 (citing Danielson v. National Supply Co., 670 N.W.2d 1, 5 (Minn. Ct. App. 2003)).  If the issue is substantive, the court applies a "multi-step choice-of-law analysis, which includes application of five choice-influencing considerations, to determine which state's law applies."  Id. (citing Jepson v. General Cas. Co. of Wi., 513 N.W.2d 467, 469 (Minn. 1994)).  If the issue is procedural, state law of the forum state applies.  See Fleeger v. Wyeth, 771 N.W.2d 524, 528 (Minn. 2009); Davis v. Furlong, 328 N.W.2d 150, 153 (Minn. 1983) ("matters of procedure and remedies [are] governed by the law of the forum state.").  Minnesota law controls the determination of whether an issue is substantive or procedural.  Nesladek v. Ford Motor Co., 46 F.3d 734, 736 (8th Cir. 1995) (citation omitted).

## C.  Cross-Motions for Summary Judgment on Gaalswyk's Claims

### 1.  Breach of Contract

In Count I of the Complaint, Gaalswyk asserted a claim for breach of contract based on King's alleged breach of her express agreement made in April 2005 to pay Gaalswyk "when she could" the hours he worked at an hourly rate of $300.  Complaint, ¶¶32-43.

King argued that Minnesota's choice-of-law rules and the case of Hoffman v. Henderson, 355 N.W.2d 322 (Minn. Ct. App. 1984) dictated the application of Iowa law to Gaalswyk's breach of contract claim.  Def. Sum. J. Mem., p. 16.  At the hearing,

King's counsel argued that Iowa law imposes a higher standard of proof as to the existence of an oral contract and, therefore, there is a conflict that requires the application of Iowa law.  Additionally, King contended that Gaalswyk's agreement to be bound by the Iowa Rules of Professional Responsibility when he was admitted pro hac vice to represent King in the Iowa litigation, required the application of Iowa law to the question of contract formation.  Def. Opp. Mem., p. 4.

Minnesota law requires the existence of "sufficient" evidence to support the existence of an oral or implied contract.  Bergstedt, Wahlberg, Berquist Assocs., Inc. v. Rothchild, 302 Minn. 476, 479, 225 N.W.2d 261, 263 (Minn. 1975) (affirming the district court's judgment that there was an implied contact between architects and property owner for architectural services on the ground that there was sufficient evidence in the record to support that conclusion).  If a plaintiff seeks to replace a written contract with an oral contract, or if the oral contract involves real property, the oral contract must be established by clear and convincing evidence.  See Bolander v. Bolander, 703 N.W.2d 529, 542 (Minn. Ct. App. 2005 ) (to justify setting aside a written contract in favor of a subsequent oral contract requires clear and convincing evidence); Ehmke v. Hill, 236 Minn. 60, 69, 51 N.W.2d 811, 817 (1952) (to obtain specific performance of an oral contract to convey real property requires a party to establish the oral contract by clear and convincing evidence.").  Iowa similarly requires that proof of an oral contract on land be established by clear and convincing evidence.  Ehlinger v. Ehlinger, 253 Iowa 187, 192, 111 N.W.2d 656, 659 (Iowa 1961).  However, the existence of an oral contract not touching on real property must only be supported by "some evidence."  O'Brien v. Biegger, 233 Iowa 1179, 1226, 11 N.W.2d 412, 433 (Iowa 1943).

The Court finds that there is no conflict of law between Iowa and Minnesota on the issue of the existence of an oral contract of the type alleged in this case and, therefore, there is no need to engage in a choice-of-law analysis. The Hoffman case relied upon by King does not change this conclusion. In Hoffman, the Minnesota Court of Appeals affirmed a district court's decision that Alaska law applied to a retainer agreement between an attorney retained to represent his client before the Alaska Workman's Compensation Board. 355 N.W.2d at 324. The amount of the fee sought by the lawyer was in excess of that permitted by the attorneys' fees provision of the Alaska Workman's Compensation Act. Id. at 323. The court concluded that because the attorney fee provision was an "integral part" of Alaska's worker's compensation scheme, it was appropriate to apply Alaska law to the question of fees. This decision, which was driven wholly by Alaska's worker's compensation statute, has no bearing on this case.

Under Minnesota law, the existence and terms of an oral contract are issues of fact generally to be decided by the fact-finder. Cherne Contracting Corp. v. Marathon Petroleum Co., 578 F.3d 735, 740 (8th Cir. 2009) (citing Bergstedt Wahlberg, Berquist Assocs., Inc. v. Rothchild, 302 Minn. 476, 225 N.W.2d 261, 263 (1975)) ("Whether a contract is to be implied in fact is usually a question to be determined by the trier of fact as an inference of facts to be drawn from the conduct and statements of the parties."). This does not preclude disposing of the question of the existence of an oral contract at the summary judgment stage, but only where no reasonable jury could find the facts necessary to entitle a plaintiff to relief. See Celotex, 477 U.S. at 322-23. The existence of an attorney-client relationship may be established through either an express or an

implied contract. TJD Dissolution Corp. v. Savoie Supply Co., Inc., 460 N.W.2d 59, 62 (Minn. Ct. App. 1990).

It is undisputed that Gaalswyk, with King's knowledge and approval, provided extensive legal services on her behalf in connection with the Iowa litigation and, to a lesser extent, in connection with her appeal. Beyond that, everything else is in dispute, including whether an oral contract was formed between Gaalswyk and King regarding the provision of legal services by him to her, and the terms of any such agreement, including payment terms and whether it covered his work on the appeal.

Gaalswyk asserts that in April 2005 King agreed to pay him $300 per hour for his work on the Iowa litigation (G4 Aff., ¶12). King claims she agreed to do work for him at his home for payment. King Aff., ¶¶12, 13 (indicating King's belief that she was providing household services as a quid pro quo for Gaalswyk's work on the Iowa litigation). King states that Gaalswyk's help on her appeal was "unsolicited" and that he "foisted" his help on O'Donohoe. Def. Sum. J. Mem., p. 13. Yet, at a minimum, King appears to have been aware of the amount of time Gaalswyk was spending on the Iowa litigation, at one point referencing her belief that "this has taken such a toll on your health." G5 Aff, Ex. C, p. 67. There is also evidence in the record that O'Donohoe solicited Gaalswyk's help with the appellate brief, and that King knew that Gaalswyk was drafting a brief because he was afraid that O'Donohoe would miss the filing deadline. King Aff., Ex. M; G5 Aff., Ex. C, p. 58. King offered payment of $20,000 to Gaalswyk and offered to transfer her interest in real property to settle Gaalswyk's claim for legal fees, which a jury could conclude amounted to an acknowledgment that there was an agreement that she would compensate Gaalswyk for his time. King maintained

this offer was simply an effort to mollify Gaalswyk.  King Aff., ¶15.  King claims that no attorney-client relationship existed except for the period of July-November, 2005.  Def. Sum. J. Mem., p. 13.  Yet King's affidavit states that she went to Gaalswyk's house in April 2005 to work on projects in exchange for Gaalswyk working on the Iowa litigation, and that in April or May he was providing King with legal advice.  King Aff., ¶¶12,13. Gaalswyk's invoice reflects time recorded from March 2, 2005 to September 24, 2006. King Aff., Ex. K.

All of these facts raise genuine issues of material facts that preclude summary judgment to either party on the issue of the existence of an oral contact between King and Gaalswyk.   Whether an agreement was reached and the terms of such an agreement are questions for the jury.   Summary judgment on this claim should be denied.

### 2.    Promissory and Equitable Estoppel

In Count II of the Complaint, Gaalswyk alleged that he worked on King's behalf in reliance on her representation that at the time of the allegedly fraudulent transfer underlying the Iowa litigation, her husband had no debts and substantial assets. Complaint, ¶45.  Gaalswyk claimed that the statement was false or made with reckless disregard as to its truth or falsity and was made to induce Gaalswyk to work on the Iowa litigation.  Id., ¶47.[2]  Gaalswyk further alleged that King promised to pay him for his

---

[2]    There is no further explanation in any of Gaalswyk's filings as how statements regarding King's husband's assets and debts affected Gaalswyk's decision to work on the Iowa litigation.   See eg., G4 Aff., ¶46 (indicating that Gaalswyk knew that King's husband had certain debts at the time Gaalswyk filed summary judgment papers in the Iowa litigation on July 29, 2005).

work, she did not intend to pay him when that promise was made, and that based on that promise, he continued to work on the Iowa litigation.  Id., ¶¶48-57.

Promissory estoppel is a concept grounded in equity that will imply "a contract in law where none exists in fact."  Grouse v. Group Health Plan, Inc., 306 N.W.2d 114, 116 (Minn. 1981).  The elements of the doctrine of promissory estoppel are: (1) a clear and definite promise; (2) intended to induce reliance, and such reliance occurred; and (3) the promise must be enforced to prevent an injustice.  Ruud v. Great Plains Supply, Inc., 526 N.W.2d 369, 372 (Minn. 1995).  Because promissory estoppel implies a contract where none exists in fact, such a claim may not proceed where a legally enforceable contract was formed.  Gorham v. Benson Optical, 539 N.W.2d 798, 801–802 (Minn. Ct. App.1995).  Promissory estoppel requires a plaintiff to show that he relied on a promise to his detriment.  Martens v. Minnesota Mining & Mfg. Co., 616 N.W.2d 732, 746 (Minn. 2000).

Equitable estoppel is a "doctrine addressed to the discretion of the court and is intended to prevent a party from taking unconscionable advantage of his own wrong by asserting his strict legal rights."  Northern Petrochemical Co. v. U.S. Fire Ins. Co., 277 N.W.2d 408, 410 (Minn. 1979).  To invoke equitable estoppel, the following elements must be shown:

> 1. There must be conduct acts, language or silence amounting to a representation or a concealment of material facts.  2.  These facts must be known to the party estopped at the time of his said conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him.  3.  The truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel, at the time when such conduct was done, and at the time when it was acted upon by him.  4.  The conduct must be done with the intention, or at least with the

> expectation, that it will be acted upon by the other party, or under such circumstances that it is both natural and probable that it will be so acted upon. * * * 5.  The conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it.  6.  He must in fact act upon it in such a manner as to change his position for the worse, in other words, he must so act that he would suffer a loss if he were compelled to surrender or forego or alter what he has done by reason of the first party being permitted to repudiate his conduct and to assert rights inconsistent with it.

Brekke v. THM Biomedical, Inc., 683 N.W.2d 771, 776 (Minn. 2004) (quoting Lunning v. Land O'Lakes, 303 N.W.2d 452, 457 (Minn.1980) (omission in original)).

Just as there are disputed facts surrounding the oral contract claim, there is a genuine dispute of material facts as it relates to Gaalswyk's claims of promissory estoppel and equitable estoppel.  For starters, as to both claims the parties dispute what representations were or were not made to each other regarding payment to Gaalswyk for whatever services he was going to provide to King.  Further, as to both claims, is the facts are in dispute as to whether King induced Gaalswyk to work on the Iowa litigation, either by promising to pay him or by remaining silent, when Gaalswyk repeatedly reminded her that he expected payment, and not merely household assistance, in exchange for his work.   Compare G4 Aff., ¶¶12, 17,19, 24 with King Aff., ¶¶12, 13 (stating that Gaalswyk called King and suggested that she come to his house in Minnesota to help him with household projects while he worked on her case and that King understood that such work would constitute an exchange for his work on the Iowa litigation.).

King argued that promissory estoppel and equitable estoppel are not available to Gaalswyk as a result of his "unclean hands" in charging an unreasonable fee and because he violated the Minnesota and Iowa Rules of Professional Responsibility by

failing to clearly define the fee arrangement with King at the outset of his representation. Def. Sum. J. Mem., pp. 22-23.  This argument is rejected.

"The equitable defense of unclean hands is premised on withholding judicial assistance from a party guilty of illegal or unconscionable conduct."  <u>Medtronic, Inc. v. Advanced Bionics Corp.</u>, 630 N.W.2d 438, 450 (Minn. Ct. App. 2001).  Unclean hands may be invoked "only against a party whose conduct has been unconscionable by reason of a bad motive, or where the result induced by his conduct will be unconscionable."  <u>Id.</u> (quotation omitted).

As a preliminary matter, this Court cannot find as a matter of law that the hourly rate of $300 an hour for an attorney practicing in the Twin Cities for thirty-three years is unreasonable.  Further, there is no requirement under the Minnesota or Iowa Rules of Professional Responsibility that a fee agreement between a lawyer and client be in writing.  <u>See</u> Minn. R. Prof. Resp., 1.5; Iowa R. Prof. Resp.32:1.5b.  Thus, this Court cannot conclude as a matter of law that Gaalswyk's failure to secure King's consent to a fee agreement in writing was "unconscionable" and amounts to unclean hands.

For all of these reasons, summary judgment to either party on Gaalswyk's claims of promissory estoppel and equitable estoppel cannot be granted.

### 3.      Fraudulent Misrepresentation

Gaalsywk's claim of fraudulent misrepresentation is largely based on the same set of facts as his estoppel claims, but in this count, Gaalswyk has claimed that King made an affirmative representation to him that she would pay his fees.  Complaint, ¶62; G4 Aff., ¶62.  Gaalswyk stated that "from the outset" King did not intend to pay him, but instead intended to "renew her arguments from April and May 2005 that brotherly love

and her de minims (sic) outdoor work for him at his home while she stayed there were payment enough for him."  G4 Aff., ¶59.

To succeed on a fraudulent misrepresentation claim under Minnesota law, a plaintiff must prove the following:

> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer[ed] pecuniary damage as a result of the reliance.

Trooien v. Mansour, 608 F.3d 1020, 1028 (8th Cir. 2010) (citing Hoyt Props., Inc. v. Production Res. Group, L.L.C., 736 N.W.2d 313, 318 (Minn. 2007)).

When allegations relate to a future event, there must be proof "that the party making the representation had no intention of performing when the promise was made." Martens v. Minnesota Mining & Mfg. Co., 616 N.W.2d 732, 747 (Minn. 2000).  See also Vandeputte v. Soderholm, 298 Minn. 505, 508, 216 N.W.2d 144, 147 (1974) ("It is a well-settled rule that a representation or expectation as to future acts is not a sufficient basis to support an action for fraud merely because the represented act or event did not take place.")

Gaalswyk alleged that in April 2005, in a telephone call initiated by King asking for help, he told King that she would have to pay for his work based on his hourly rate of $300 per hour and that she agreed.  G4 Aff., ¶12.  In support of his claim when she made this agreement, she never intended to pay him (id., ¶59), Gaalswky presented evidence that King induced and continued to induce him to work on the Iowa litigation without ever telling him that she did not intend to pay him.  For example, the emails

between Gaalswyk and King indicate that King was aware of and encouraged the effort Gaalswyk was putting into the Iowa litigation on her behalf, while never informing him that she would not pay his fees. See G5 Aff., Ex. A. pp. 4-5, 7, 12, 15-22, 26, 37-38, 48, 76, 92. As for proof of pecuniary damage, Gaalswyk's invoice to King showed that he devoted 543 hours to her case. See King Aff., Ex. K (bill for legal services).

On the other hand, King submitted that it was "impossible" for Gaalswyk to prevail on a claim of fraudulent misrepresentation because she and Gaalswyk agreed that her provision of household services was in exchange for his legal services and that her services were his "compensation." Def. Sum. J. Mem., p. 25; King Aff., ¶¶12, 13. King also maintained that to the extent that such a representation might have been made, it was unreasonable for Gaalswyk to rely on it in light of her "strained financial circumstances." Id. However, King did admit that the annuity at issue in the Iowa litigation was worth $880,267, and that the current balance is $491,206.08. King Aff., ¶¶4, 22.

There are genuine dispute of material facts that bear on Gaalswyk's claim of fraudulent misrepresentation. As a result, summary judgment on this claim should be denied as to either party.

### 4. Quantum Meruit, Quasi-Contract and Unjust Enrichment

Gaalswyk alleged that his work on behalf of King, including trying the Iowa litigation, conferred on King the benefit of the $880,000 transfer to her from her husband, which was challenged by the plaintiff in the Iowa litigation as fraudulent. G4 Aff., ¶69. According to Gaalswyk, it would inequitable and unjust for King to accept his services and the benefit he conferred upon her, without paying him the reasonable

value of those services. Id., ¶¶70, 74, 75.  Consequently, if no oral contract is found to exist between him and King, then Gaalswyk asserted that King should pay him $143,140 plus interest under the doctrines of quantum meruit, quasi-contract or unjust enrichment. Id., ¶¶72, 76.

In the absence of a written contract, a plaintiff may recover damages based on the equitable concepts of quantum meruit, quasi-contract or unjust enrichment. "Quantum meruit is a measure of remedy and does not arise absent a showing of unjust enrichment." Moua v. Jani-King of Minn., Inc., Civ. No. 08-4942 (ADM/JSM), 2010 WL 935758 at *6 (D. Minn., March 12, 2010) (quotation and citations omitted).  A quasi contract is an obligation raised or imposed by law and is independent of any real or expressed intent of the parties.  Roske v. Ilykanyics, 232 Minn. 383, 389, 45 N.W.2d 769, 774 (1951) (quoted in Mjolsness v. Mjolsness, 363 N.W.2d 839, 842 (Minn. Ct. App.1985)).  "Under the theory of a quasi contract, an obligation is defined in equity and good conscience and is imposed by law to prevent unjust enrichment at the expense of another." Marking v. Marking, 366 N.W.2d 386, 387 (Minn.App.1985) (quoting Dusenka v. Dusenka, 221 Minn. 234, 238, 21 N.W.2d 528, 530-31 (Minn.1946)).  A quasi contract is "a benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for him to retain it without paying the value thereof." Acton Constr. Co. v. State, 383 N.W.2d 416, 417 (Minn. Ct. App.1986), review denied (Minn. May 22, 1986).

Unjust enrichment is based on what the person allegedly enriched has received, not on what the opposing party has lost. Georgopolis v. George, 237 Minn. 176, 185,

54 N.W.2d 137, 142 (Minn. 1952).  Damages in quantum meruit and unjust enrichment are measured by the value of the benefit conferred.  <u>Instrumentation Servs., Inc. v. General Research Corp.</u>, 283 N.W.2d 902, 909 (Minn. 1979); <u>Anderson v. DeLisle</u>, 352 N.W.2d 794, 796 (Minn. Ct. App. 1984), <u>review</u> <u>denied</u> (Minn. Nov. 8, 1984).

Gaalswyk submits that it was through his efforts that King prevailed in the Iowa litigation.  G4 Aff., ¶¶20-30.  King disagrees and minimizes Gaalswyk's contributions to the Iowa litigation.  For example, the Anderson affidavit, submitted in connection with her motion for summary judgment, indicated that Anderson received only a few suggestions of "variable value" from Gaalswyk between April and July 2005 and that if Gaalswyk had not appeared in the case at all, Anderson would have only billed an additional ten to fifteen hours of his time, at $140 per hour.  Anderson Aff., ¶¶8, 14.

Emails written by King about Anderson's work and Gaalswyk's contributions tell a different story.  For example, on August 17, 2005, King wrote to Gaalswyk, "I thought you were terrific.  Matt could have stayed home.  If the judge takes the time to read your papers like you suggested we can end this."  G5 Aff., Ex. A, p. 50.  On September 17, 2005 King wrote:  "You [Gaalswyk] have the final say but that is what I'm thinking.  We had pretty much told Matt [Anderson] in April that you were taking over.  He knows what we think of him.  I'm sure he has been insulted so he really has only done what you have asked him to do."  <u>Id.</u>, p. 90.  As to the trial, Anderson wrote to Gaalswyk that he would be available for "consultation" and he "planned" on attending the first two days of the trial.  <u>Id.</u>, p. 98.  When King learned that the Iowa litigation had resolved in her favor, she wrote to Gaalswyk that "I am so emotional right now and so grateful! * * *Thanks to you, the judge believed us.  I was confident because of all your hard work preparing me

for the trial. The judge did read your papers and understood what was going on." Id., p. 117.

Because there are genuine disputes of material fact as to whether Gaalswyk's work on the Iowa litigation benefitted King, whether he did or did not intend to provide his services gratis, for a fee, or for work performed by King for him, and whether King unjustly retained the benefit of his services without paying for them, the Court concludes that summary judgment for either party on Gaalswyk's claims of quantum meruit, quasi contract and unjust enrichment is no appropriate.

### 5. Account Stated

"An account stated is a manifestation of assent by a debtor and creditor to a stated sum as an accurate computation of an amount due the creditor." Cherne Contracting Corp. v. Wausau Ins. Cos., 572 N.W.2d 339, 345 (Minn. Ct. App.1997), review denied (Minn. Feb. 19, 1998). It constitutes prima facie evidence of the debtor's liability and can be challenged only by a showing of fraud or mistake. Erickson v. Gen. United Life Ins. Co., 256 N.W.2d 255, 259 (Minn. 1977). "A party's retention without objection for an unreasonably long time of a statement of account rendered by the other party is a manifestation of assent." Lampert Lumber Co. v. Ram Constr., 413 N.W.2d 878, 883 (Minn. Ct. App.1987).

Gaalswyk sent his invoice for services to King on May 8, 2009. King Aff., Exs. J, K. King's lawyer, O'Donohoe, responded on May 14, 2009. Id., Ex. N. It is true that O'Donohoe's response did not expressly reject the invoice; however, the gist of her response was that King would not pay it. Id. That response, coupled with King's previous refusal to pay Gaalswyk the $50,000 he had demanded in June 2006, clearly

shows that King objected to Gaalswyk's fees.  <u>See</u> King Aff., ¶15.  Under these facts, no jury could find that King had manifested agreement to the sums stated in Gaalswyk's invoice.  Gaalswyk's claim of account stated fails as a matter of law and summary judgment should be granted in favor of King on that claim.

### 6.   Attorney's Lien

Gaalswyk has combined his motion for summary judgment with a motion to establish an attorney's lien pursuant to Minn. Stat. §481.13 attaching to King's Lincoln National Insurance funds.  <u>See</u> Pl. Sum. J. Mem., pp. 1-2, 15-16.  Gaalswyk sought an evidentiary hearing on the issue of the lien.  <u>Id.</u>, p. 2.  King has moved for summary judgment on the lien claim, contending that: (1) Minnesota's lien statute requires that the summary proceeding to establish the lien must be conducted in the same court in which the attorney represented the client; (2) a lien on property that is not the same property involved in the litigation is not allowed; and (3) a choice-of-law analysis dictates the application of Iowa law and Iowa law does not permit a lien on property in the client's possession "under any circumstances."  Def. Sum. J. Mem., pp. 33-38.  At oral argument on the motion, King's counsel asserted that the Court had no jurisdiction over King's property, since both King and the property are located in Iowa.

Pursuant to Minn. Stat. §481.13, subd. 1(a), an attorney "has a lien for compensation whether the agreement for compensation is express or implied … upon the interest of the attorney's client in any money or property involved in or affected by any action or proceeding in which the attorney may have been employed …."  An attorney's lien may be established, and the amount of the lien may be determined, "summarily by the court under this paragraph on the application of the lien claimant."

Minn. Stat. §481.13, subd. 1(c).   The phrase "by the court under this paragraph" "empowers a court to establish a lien without regard to whether or not the action or proceeding in which the fees were incurred was before that court."   Northern States Power Co.v. Gas Servs., Inc., 690 N.W.2d 362, 363 (Minn. Ct. App. 2004).   In a summary proceeding, the court must determine the lienholder, the subject of the lien and the amount due.   Dorsey & Whitney, LLP v. Grossman, 749 N.W.2d 409, 422 (Minn. Ct. App. 2008).

Iowa's attorney lien statute is narrower and only permits an attorney's lien to attach to (1) any papers belonging to a client which have come in the attorney's hands in the course of professional employment; (2) money in the attorney's hands belonging to the client; or (3) money due a client in the hands of the adverse party, or attorney of such party, in an action or proceeding in which the attorney claiming the lien was employed.  Iowa Code, §602.10116.

Other states grappling with the question of which state's law should apply to a proceeding to establish an attorney's lien have determined the issue by the "law of the state in which the legal services are to be performed."   In re Engage,Inc., 315 B.R. 208, 212 (D. Mass. 2004), affirmed by In re Engage, Inc., 330 B.R. 5 (D. Mass 2005) (citing Matter of Fitterer Engineering Associates, Inc., 27 B.R. 878, 879–80 (Bankr.E.D.Mich.1983) (citing 7 Am.Jur.2d § 351 at 354 (holding that "the existence and effect of an attorney's lien is governed by the law of the state in which the legal services are to be performed")).   See also Lehigh & N.E.R. Co. v. Finnerty, 61 F.2d 289, 290 (3rd Cir.), cert. denied 287 U.S. 668 (1932) ("The contract does not expressly state where the parties intended that suit should be brought, but the employment of an attorney of

New Jersey and the bringing of suit in New Jersey indicate that the parties intended that from the first that suit should be brought in that state.  And being brought there, the laws of that state control as to the lien."); U.S. v. 72.71 Acres of Land, More or Less, Situate[d] in Montgomery County, Md., 167 F. Supp. 512, 516 (D. Md.1958) (applying Maryland law "where the attorneys' contract for compensation was made in and intended to be performed mostly in Maryland.").

Applying the reasoning of these cases, it is possible that a court could find that either Minnesota or Iowa's attorney lien statute would apply, as Gaalswyk performed services in both Minnesota and Iowa for litigation venued in Iowa.  However, application of Minnesota's choice-of-law rules dictates that Minnesota law should apply.

There is clearly a conflict between Minnesota's attorney lien statute which would permit attachment of King's insurance annuity and Iowa's statute, which does not permit attachment of funds in the client's possession.   Applying Minnesota's choice-of-law rules, the Court must then determine whether Iowa or Minnesota law may be constitutionally applied.  See Glover, 345 F.Supp.2d at 995.  King is an Iowa resident and the funds Gaalswyk seeks to attach are held in a Lincoln Financial annuity in King's physical control.  Gaalswyk performed much of his legal work in Minnesota, although he tried the case in Iowa.  Both states have contacts and interests sufficient to make the application of either state's law constitutional.

Next, the Court must decide whether the rule of law at issue is substantive or procedural.  Glover, 345 F. Supp. 2d at 998 (citing Danielson v. National Supply Co., 670 N.W.2d 1, 5 (Minn. Ct. App. 2003)).   Minnesota has not decided whether an attorney's lien is a substantive or procedural issue.  However, the Minnesota Supreme

Court has defined substantive law as "that part of the law which creates, defines, and regulates rights," as opposed to procedural or remedial law, "which prescribes method[s] of enforcing the rights or obtaining redress for their invasion."  Meagher v. Kavli, 88 N.W.2d 871, 879-80 (1958).

Minnesota's attorney lien statute creates a remedy for the lawyer who has gone unpaid after securing a judgment on behalf of his or her client.   The statute is an expression of this state's public policy that an attorney is owed protection against "a successful party receiving a judgment secured by an attorney's services without paying for those services."  Thomas A. Foster & Assoc.Ltd. v. Paulson, 699 N.W.2d 1, 5 (Minn. Ct. App. 2005).  This Court concludes that the attorney's lien and the summary nature of the proceedings to establish the lien establishes that it is remedial in nature.  Therefore, the Court finds that the attorney's lien statute is procedural rather than substantive, and the law of the forum state, i.e. Minnesota, should apply to Gaalswyk's claim.   Under Minnesota's lien statute, Gaalswyk may have the right to establish an attorney's lien on King's annuity.[3]   On this basis, King's motion for summary judgment on Gaalswyk's attorney lien claim should be denied.

Having determined that King is not entitled to summary judgment on the attorney lien claim, however, does not lead this Court to conclude that Gaalswyk is entitled to an immediate evidentiary hearing on the lien.

---

[3]     King has provided no support for her theory that a lien cannot attach to money or property that has been exchanged for other property, and the Court has found no case that stands for that proposition.  But see In re Marriage of Smith, 687 P.2d 519, 520 (Colo. Ct. App. 1984) (attorney's lien may attach to real property acquired in exchange for cash disbursed as part of a settlement where the parties had notice of the attorney's claim for a lien before the exchange, and where the cash settlement had been depleted).

Whether King owes Gaalswyk any money for his services, whether she agreed to pay for his services and if so, how much and at what rate, are all contested issues in this case. Gaalswyk's quest for an attorney's lien as a method of compensation cannot usurp the determination of these substantive issues. In the event Gaalswyk prevails at trial and obtains a judgment against King, he may attempt to execute that judgment against King's assets via an attorney's lien or other means. However, at this juncture, where factual issues are outstanding as to what, if anything, Gaalswyk is entitled, he cannot proceed with an evidentiary hearing on the lien claim at this time.

D.    **Gaalswyk's Motion for Summary Judgment on King's Counterclaims**

1.    **Restitution**

King's claim for restitution is based on her claim that Gaalswyk would not pay her the proceeds from their mother's estate until she paid him $20,000 in legal fees. Amended and Substituted Answer and Counterclaims, ¶83. King maintained that she paid the $20,000 under "duress" and "coercion" and did so only to receive her portion of her mother's estate. Id., ¶84. King alleged that Iowa common law governed this claim. Id., ¶86. Gaalswyk submitted he was entitled to summary judgment on her restitution claim because the undisputed evidence was that King received the proceeds of her mother's estate on May 10, 2006, and that she paid Gaalswyk on June 7, 2006. G4 Aff., p. 104. Further, King did not attempt to cancel the check in the three days before Gaalswyk deposited it. Id., p. 105. Under those facts, Gaalswyk argued that the $20,000 payment could not have been coerced by a threat. Id.

Under both Minnesota and Iowa law, restitution is an equitable remedy, not a cause of action. See State by Humphrey v. Alpine Air Prods., Inc., 490 N.W.2d 888,

896 (Minn. Ct. App. 1992), aff'd on other grounds, 500 N.W.2d 788 (Minn. 1993); Iowa Waste Sys., Inc. v. Buchanan County, 617 N.W.2d 23, 29 (Iowa Ct. App.2000). ("[t]he doctrine of unjust enrichment serves as a ground for the remedy of restitution."). Consequently, in the absence of any causes of action against Gaaslwyk in equity, the "claim of restitution" could be dismissed on that basis alone. However, to the extent that King's counterclaim could be construed as a claim that her payment was involuntarily made because it was based on duress and coercion, the undisputed facts presented do not support that claim. Contrary to King's assertion in her counterclaim, the facts indicate that she first received the funds from her mother's estate and then paid Gaalswyk, thus contradicting her claim that Gaalswyk was withholding estate funds until she paid him. King Aff., ¶15. In addition, King's authorization to O'Donohoe to offer Gaalswyk her interest in some real property to settle matters, in addition to the $20,000 payment, is entirely inconsistent with her claim that the $20,000 was obtained by duress or coercion. See King Aff., Ex. N.

Based on these undisputed facts, the Court recommends summary judgment on King's counterclaim for restitution.

### 2. Legal Malpractice

King's legal malpractice counterclaim is based on her assertion that Gaalswyk provided duplicative and unnecessary legal work, he was not licensed to practice law in Iowa, and he "indicated" to King that he could recover her attorney's fees in the Iowa litigation. Amended and Substituted Answer and Counterclaims, ¶¶99-101. Gaalswyk moved for summary judgment on this claim, arguing that his representation of King was not negligent (G4 Aff., pp. 110-116) and that, at any rate, King had failed to submit the

initial expert affidavit required by Minn. Stat. §544.42, subd. 3(a)(1). Plaintiff's Reply Memorandum in Support of His Motions to Establish Attorney's Lien and for Summary Judgment, pp 19-21 [Docket No. 125]. King claimed that Iowa law governed this claim and Iowa law does not require an initial expert affidavit before a plaintiff can plead legal malpractice. Def. Opp. Mem., p. 12. King also argued that in support of her malpractice claim she has provided expert opinions in the form of affidavits from Matt Anderson and James F. Dunn (see Def. Opp. Mem., Appx. pp. 1-2 [Docket No. 58]; 304-305 [Docket No. 61]. Id., p. 12.

In support of his motion, Gaalswyk submitted facts that he attempted to obtain Rule 11 sanctions in the form of attorneys' fees for King, but the Iowa district court did not grant his request. G4 Aff., p. 112. He further explained that he did not seek post-trial sanctions in the form of an award of attorney's fees because he was worried that such a motion could "backfire," in the sense that King could have lost the Iowa plaintiff's motion for amended findings or an appeal. Id., p. 113. Gaalswyk also pointed out that Anderson similarly failed to move for attorney's fees at the post-trial stage, even though he was still representing King. Id., p. 116.

Under Minnesota law, a claim for malpractice requires "'(1) the existence of an attorney-client relationship; (2) acts constituting negligence or breach of contract; (3) that such acts were the proximate cause of the plaintiff's damages; [and] (4) that but for defendant's conduct, the plaintiff would have been successful in the prosecution or defense of the action.' " Jerry's Enters., Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd., 711 N.W.2d 811, 816 (Minn.2006) (quoting Blue Water Corp. v. O'Toole, 336 N.W.2d 279, 281 (Minn.1983)). Expert testimony is generally required to establish the "standard

of care, applicable to an attorney whose conduct is alleged to have been negligent, and further to establish whether the conduct deviated from that standard." Id. at 817. "However, such expert testimony is not necessary when the matters to be proven are within the area of common knowledge and lay comprehension." Hill v. Okay Constr. Co., 252 N.W.2d 107, 116 (Minn. 1977).

Where a party does intend to rely on expert testimony to establish a prima facie case of malpractice, the party is required to comply with the mandates of Minn. Stat. §544.42. This statute requires the attorney for a party asserting a claim of malpractice to serve at the same time as the service the pleading making the claim, an initial expert affidavit of review stating that the lawyer's conduct fell below the applicable standard of care. See Minn. Stat. §544.42, subd. 2(1). The statutory requirements of the affidavit are exacting and require the attorney for the party alleging malpractice to draft the affidavit and state under oath:

> The facts of the case have been reviewed by the party's attorney with an expert whose qualifications provide a reasonable expectation that the expert's opinion could be admissible at trial and that, in the opinion of the expert, the defendant deviated from the applicable standard of care and by that action caused injury to the plaintiff.

Minn. Stat. 544.42, subd. 3(a)(1).

Then within 180 days of the service of the pleading asserting malpractice, the attorney for the party asserting this claim must serve an affidavit stating the following:

> the identity of each person whom the attorney expects to call as an expert witness at trial to testify with respect to the issues of negligence, malpractice, or causation, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion. Answers to interrogatories that state the information required by this subdivision satisfy the requirements of this

subdivision if they are signed by the party's attorney and served upon the opponent within 180 days after commencement of the action against the defendant or within 180 days after service of the affidavit required by subdivision 3, paragraph (a), clause (2) or (3).

Minn. Stat. §544.42, subd. 4(a).

Failure to comply with these provisions can lead to the mandatory dismissal of the malpractice claim.  See Minn. Stat. §544.42, subd. 6.

Under Iowa law, to establish a prima facie case of legal malpractice, the plaintiff must have introduced substantial evidence that shows: "(1) the existence of an attorney-client relationship giving rise to a duty; (2) the attorney either by an act or failure to act, violated or breached that duty; (3) the attorney's breach of duty proximately caused injury to the client; and (4) the client sustained actual injury, loss, or damage." Schmitz v. Crotty, 528 N.W.2d 112, 115 (Iowa 1995) (citing Dessel v. Dessel, 431 N.W.2d 359, 361 (Iowa 1988)).  The proximate cause prong of the Iowa elements of legal malpractice has repeatedly been defined as a "but for" test—but for the attorney's negligence, the loss would not have occurred.  See, eg. Ruden v. Jenk, 543 N.W.2d 605, 611 (Iowa 1996); Blackhawk Bldg. Sys., Ltd. v. Law Firm of Aspelmeier, Fisch, Power, Warner & Engberg, 428 N.W.2d 288, 290 (Iowa 1988).

Generally, expert testimony is required on the standard in a legal malpractice claim under Iowa law.  Crookham v. Riley, 584 N.W.2d 258, 266 (Iowa 1988).  Expert testimony is not required where "the proof is so clear and obvious that a trial court could, with propriety, rule as a matter of law whether the lawyer met applicable standards." Baker v. Beal, 225 N.W.2d 106, 112 (Iowa 1975).  Where expert testimony is required, Iowa Code § 668.11(1)(a) provides that the expert must be designated

within 180 days after the defendant's answer unless the court for good cause extends the time.

Except for the requirement of the initial expert affidavit, Iowa and Minnesota law are not appreciably different.  However, because of the conflict between the two states' laws regarding the expert affidavits, this Court must conduct a choice-of-law analysis.

Gaalswyk completed a great deal of his legal work in Minnesota, and Minnesota has a vested interest in ensuring that its licensed attorneys are paid for their work.  At the same time, some of his work, such as the trial of the Iowa litigation, was conducted in Iowa and on behalf of an Iowa citizen.  Thus, the laws of either state may be constitutionally applied.  Glover, 345 F.Supp.2d at 995.

The Court must then determine whether the requirement of an affidavit of initial review is substantive or procedural.  Based on Minnesota's definition of procedural or remedial law, "which prescribes method[s] of enforcing the rights or obtaining redress for their invasion," Meagher, 88 N.W.2d at 879-80, it is clear that the requirement of the initial affidavit is procedural, not substantive.  As a result, Minnesota law applies to King's malpractice counterclaim.

Based on Minnesota law, this Court finds that King's counterclaim of legal malpractice required an initial expert affidavit, and her failure to provide one is fatal to her claim.

Moreover, even if this Court had concluded that Iowa law applied and that King was not required to supply an initial expert affidavit, summary judgment must be granted on this claim as she has presented no facts or expert opinion to support a claim of legal malpractice.  For example, even if a jury were to conclude that Gaalswyk had provided

duplicative and unnecessary legal work and that it was negligence for him to assist in the Iowa litigation because he was not licensed to practice law in Iowa, King has provided no evidence or expert opinion that she was injured or sustained any injury from this conduct.  Likewise, as to Gaalswyk's alleged failure to obtain an award of attorney's fees for her in the Iowa litigation,[4] whether or not Gaalswyk had promised that he could recover King's attorney's fees for her, King has failed to present any facts to show that "but for" his handling of the attorney's fees issue, she would have been granted attorney's fees.

Finally, as to King's reliance on the affidavits of Anderson and Dunn in support of her opposition to summary judgment on the malpractice claim, their affidavits provide no assistance as neither affidavit contain an opinion regarding the substance of Gaalswyk's work on King's behalf much less a breach of the standard of care.  See Anderson Aff.; Affidavit of James F. Dunn [Docket No. 61].  Indeed, King admits that  "[t]he expert disclosures provided in the federal action…reserve precise opinions regarding the alleged misrepresentations until such time as information can be obtained through deposition from Richard Gaalswyk explaining his justification for these representations." Def. Opp.  Mem., p. 12.

For all of these reasons, this Court concludes that Gaalswyk is entitled to summary judgment on King's malpractice claim because she has submitted no evidence to support such a claim.

---

[4]     King claimed to have been damaged in the amount of $180,614.84.  She did not specify what this figure represents, but this Court assumes that this constitutes the total amount of fees she incurred in defending the Iowa litigation.  The Court does not know if this sum includes Anderson's fees only or if it also includes fees charged by or paid to Gaalswyk.

### 3.      Libel

King alleged that Gaaslwyk's 25-page, May 8, 2009 letter was defamatory because: (1) the statements in the letter were communicated to "other family members"; (2) the statements were false; (3) the statements harmed King's reputation; and (4) King was damaged as a result of the harm to her reputation.   Amended and Substituted Answer and Counterclaims, ¶¶104-108.   King characterized her claim as one of "libel per se" in her response to Gaalswyk's motion for summary judgment.   See Def. Opp. Mem., p. 14.

Gaalswyk claimed that the statements in the letter were true, and that it was nothing more than a "dispassionate, temperate, non-judgmental and reasonable attempt to collect a debt and reach a settlement."   G4 Aff., p. 117, 116, 118.

Minnesota law requires a claim for defamation to be pled "with a certain degree of specificity."   Schibursky v. International Business Machines, Co., 820 F. Supp. 1169, 1181 (D. Minn. 1993).   To establish a claim for defamation, the plaintiff must prove "that a statement was false, that it was communicated to someone besides the plaintiff, and that it tended to harm the plaintiff's reputation and to lower him in the estimation of the community."   Richie v. Paramount Pictures Corp., 544 N.W.2d 21, 25 (Minn. 1996) (quotation omitted).   When a statement is defamatory per se, the statement is "actionable without proof of special damage."   Anderson v. Kammeier, 262 N.W.2d 366, 372 (Minn. 1977).   In that situation, general damages are presumed, and a plaintiff may recover without any proof that the defamatory publication caused him or her actual harm. Becker v. Alloy Hardfacing & Eng'g Co., 401 N.W.2d 655, 661 (Minn.1987). "Among the types of actions which are defamatory per se are false accusations of

committing a crime* * *."   Id.   Also, "[a] statement is defamatory per se if it imputes serious sexual misconduct to the subject of the statement."   Baufield v. Safelite Glass Corp., 831 F. Supp. 713, 717 (D. Minn. 1993).   See also Restatement (Second) of Torts, §570 (gathering cases in which the publication of statements imputing criminal offenses, a loathsome disease, matters incompatible with business, trade, profession or office and serious sexual misconduct have been found to be defamatory per se) (cited favorably by Richie, 544 N.W.2d at 26, n. 3.).

Summary judgment on King's libel claim should be granted.   As an initial matter, the Court notes that King has not established that Sheila Gaalswyk read the May 8, 2009 letter that she claims is defamatory per se.   At her deposition, all that Sheila Gaalswyk stated was that she saw an "online version" of the letter.   Def. Opp. Mem., Appx. p. 453 [Docket No. 61].   In her affidavit submitted in support of Gaalswyk's motion for summary judgment, Sheila Gaalswyk stated that Gaalswyk "e-mailed his draft of a letter to [King] in May 2009....I did not add anything to what the draft said, just review (sic) as discussed above and tell him what I found."   S. Gaalswyk Aff., ¶¶ 8, 9 [Docket No. 105].   In any event, even if King could establish the publication element for libel, the statements in the letter that she needed to be trained to tell the truth, the work she did for him was worth $10 per hour, and she was unable to think in a disciplined manner, (King Aff., Ex. J, pp. 2, 3, 19, 23-24), are not of the sort of communications that give rise to a claim of defamation per se.   See Restatement (Second) of Torts, §570. Alternatively, King has presented no facts to show that her reputation in the community suffered as a result of the publication of the letter, even assuming that Sheila Gaalswyk's review of a draft version of the letter constituted "publication."

For all of these reasons, King's counterclaim for libel, whether characterized as defamation or defamation per se cannot survive Gaalswyk's motion for summary judgment.

## III.    CONCLUSION

In summary, except for Gaalswyk's "account stated" claim, all of his claims are factually in dispute and must be decided by a trier-of-fact.  As for King's claims, all fail as a matter of law based on undisputed facts (restitution) or lack of facts (malpractice and libel), and accordingly, summary judgment in Gaalswyk's favor on these claims should be granted. For all of the foregoing reasons,

**IT IS RECOMMENDED THAT:**

1.      Defendant's Motion for Summary Judgment [Docket 52] be granted as to Count VI, Account Stated, and denied as to all other counts.

2.      Plaintiff's Motion for Summary Judgment [Docket No. 75] be GRANTED as to defendant's counterclaims and his application for an attorney's lien be DENIED.


Dated: August 2, 2011                              *Janie S. Mayeron*
                                                   JANIE S. MAYERON
                                                   United States Magistrate Judge

**NOTICE**

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **August 16, 2011,** a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.   A party may respond to the objecting party's brief within fourteen days after service thereof.   All briefs filed under this Rule shall be limited to 3500 words.   A judge shall make a de novo determination of those portions to which objection is made.   This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.   Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **August 16 2011.**